UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE No.: 24-CV-22897

UNITED STATES LIABILITY INSURANCE CO.,
A foreign corporation

                         Plaintiff,

vs.

INTERNATIONAL YACHT BROKER'S ASSOC. INC.,

                         Defendants.
_____/

## UNITED STATES LIABILITY INSURANCE COMPANY'S
## MOTION FOR SUMMARY FINAL JUDGMENT

Plaintiff, UNITED STATES LIABILITY INSURANCE COMPANY, ("USLI"), pursuant to Fed. R. Civ. P. 56(a), and L.R. 56.1, respectfully files this Motion for Summary Final Judgment declaring that no coverage is afforded under USLI's Policy for the claims which have been alleged against its insured, Defendant, INTERNATIONAL YACHT BROKER'S ASSOC. INC., ("IYBA"), in the underlying *YA MON* Class Action and that USLI has no duty to defend or indemnify IYBA in that action and states as follows:

### INTRODUCTION

In this insurance coverage action USLI seeks a declaration that no coverage is afforded under its Non Profit Management Liability insurance policy which was issued to IYBA for any damages which have been alleged against IYBA in the underlying class action and that USLI has no duty to defend or indemnify IYBA in the action. The question of whether or not USLI's policy

affords coverage for the underlying class action is a purely legal issue which is properly resolved on summary judgment.

## ARGUMENT AND MEMORANDUM OF LAW

### *Summary Judgment Standard*

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). *See also William Penn Life Ins. Co. of New York v. Sands*, 912 F.2d 1359 (11th Cir. 1990). The U.S. Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial – whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The existence of some factual disputes will not defeat an otherwise properly supported motion for summary judgment. "The requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material only when its resolution effects the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id*. at 252. Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Summary judgment is particularly appropriate to resolve questions of insurance coverage, since the interpretation of a written contract is a matter of law to be determined by the court. *Philadelphia Indem. Ins. Co. v. Florida Memorial University,* 307 F.Supp.3d 1343 (S.D. Fla. 2018); *Falcon Trust Group, Inc. v. Travelers Cas. & Sur. Co.*, 725 F.Supp.2 1363 (S.D. Fla. 2010); *Philadelphia Indemnity Ins. Co. v. Yachtsman's Inn Condo Assoc., Inc.*, 595 F.Supp.2d 1319 (S.D. Fla. 2009).

### *Policy Construction*

"The construction of insurance contracts is governed by substantive state law," which in this case is Florida. *Atlantic Cas. Ins. Co. v. Ca'D'Oro*, 362 F.Supp.3d 1268, 1272 (S.D. Fla. 2018), *citing Provau v. State Farm Mut. Auto. Ins. Co.*, 772 F.2d 817, 819 (11th Cir. 1985). Under well-settled Florida law, an insurance policy is treated like a contract, and, therefore, ordinary contract principles govern the interpretation and construction of insurance policies. *Vozzcom, supra*. "[I]nsurance contracts must be construed in accordance with the plain language the policy." *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.,* 845 So.2d 161, 165 (Fla. 2003). If the language of the policy is clear, there is no need for judicial construction and the contract must be simply enforced as written. *Taurus Holdings, Inc. v. U.S.Fid. & Guar. Co.,* 913 So.2d 528, 532 (Fla. 2005) ("If a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision.") "It is only 'when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to ordinary rules of construction' that such an ambiguity will be construed in favor of coverage." *Philadelphia Indem. Ins. Co. v. Florida Memorial University,* at 1347, quoting *Taurus Holdings, Inc. v. U.S.Fid. & Guar. Co.,* at 532.

Terms used in an insurance policy should be read in light of the skill and experience of ordinary people. *General Star Indemnity Co. v. West Florida Village Inn, Inc*., 874 So.2d 26 (Fla. 2nd DCA 2004). The absence of a definition of an operative term, does not, by itself, create ambiguity. *State farm Fire & Cas. Co. v. CTC Dev. Corp*., 720 So.2d 1072, 1076 (Fla. 1998). Rather, "[w]hen a term in an insurance policy is undefined, it should be given its plain and ordinary meaning, and courts may look to legal and non-legal dictionary definitions to determine such a meaning." *Government Employees Ins. Co. v. Macedo*, 228 So.2d 1111,1113 (Fla. 2017).

### *The Duty to Defend Standard*

Under well-settled Florida law, a liability insurer's duty to defend is governed *entirely* by the allegations of the complaint against the insured. *Philadelphia Indemnity Ins. Co. v. Yachtsman's Inn Condo Assoc., Inc.*, 595 F.Supp.2d 1319 (S.D. Fla. 2009); *Jones v. Florida Ins. Guar. Assoc., Inc.*, 908 So.2d 435 (Fla. 2005); *National Union Fire Ins. Co. v. Lenox Liquors Inc.*, 358 So.2d 533 (Fla. 1977); *Adolfo House Distributing Corp. v. Travelers Property and Cas. Ins. Co*., 165 F.Supp.2d 1332, 1335 (S.D. Fla. 2001):

> In Florida… an insurer's duty to defend hinges on whether the allegations of the complaint state a claim, which potentially falls within the coverages defined by the policy. *This question is resolved strictly by reference to the allegations in the underlying complaint, not by the actual facts, the insured's version of the facts or the insurer's defenses*. (Emphasis supplied.)

Indeed, "*where the actual facts are inconsistent with the allegations in the complaint, the allegations in the complaint control in determining the insurer's duty to defend*." *Jones v. Florida Ins. Guar. Assoc., Inc*., 908 So.2d 435, 443 (Fla. 2005). For this reason, Florida courts hold that in determining whether an obligation to defend exists, a court may not consider *any* matters outside

the four corners of the complaint against the insured. *Atlantic Cas. Ins. Co. v. Ca'D'Oro*, 362 F.Supp.3d 1268, 1273 (S.D. Fla. 2018):

> The Court rejects Defendant's contention that it should look beyond the four corners of the State Court Complaint on the basis determination of the duty to defend "strictly by looking at the pleading, particularly conclusory pleading, and [putting] blinders on as to what it actually knows, is unfair." (Internal citations omitted). Defendant cites no case or legal authority for its position the Court should ignore binding Florida law, and the Court will not disregard the requirements set forth by Florida courts – regardless of whether or not these requirements are "unfair." The Court thus considers only the State Court Complaint and the language of the Policy in determining whether Plaintiff has a duty to defend.

*See also Wackenhut*, 15 F.Supp.2d at 1322 (no duty to defend insured in an action in which plaintiff alleged only excluded intentional conduct by insured even if plaintiff could also recover on negligence theory); *Auto Owners Ins. Co. v. Travelers Cas. & Sur. Co.*, 227 F.Supp.2d 1248, 1258 (M.D. Fla. 2002) ("actual facts" do not control the duty to defend); *Chicago Title Ins. Co. v. CV Reit, Inc.*, 588 So.2d 1075, 1076 (Fla. 4th DCA 1991) (insured's conclusions based upon a theory of liability that has not been pled are irrelevant to the duty to defend); *Fun Spree Vacations v. Orion Ins. Co.*, 659 So.2d 419, 421 (Fla. 3d DCA 1995) (improper for court to consider reasonable inference from allegations of complaint.)

If the complaint against the insured does not allege any damages, which are potentially within the policy's coverage, the insurer is not obligated to defend. *Philadelphia Indemnity Ins. Co. v. Yachtsman's Inn Condo Assoc., Inc.*, 595 F.Supp.2d 1319 (S.D. Fla. 2009); *Wackenhut Services, Inc., v. National Union Fire Ins. Co.,* 15 F.Supp.2d 1314 (S.D. Fla. 1998). And because the duty to defend is broader than the duty to indemnify, a determination that there is no duty to defend logically requires a finding that there is also no duty to indemnify. *Philadelphia Indemnity*

*Ins. Co. v. Yachtsman's Inn Condo Assoc., Inc.*, 595 F.Supp.2d 1319 (S.D. Fla. 2009); *Nova Cas. Co. v. Wasserstein*, 424 F. Supp. 2d 1325 (S.D. Fla. 2006); *Allstate Ins. Co. v. Safer,* 317 F. Supp.2d 1345 (M.D. Fla. 2004); *Council v. Paradigm Ins. Co.,* 133 F.Supp.2d 1339 (M.D. Fla. 2001).

### *The Policy's Standard Setting Exclusion Bars Coverage for the Underlying Lawsuit*

As more fully detailed above, the underlying complaint alleges that IYBA and the other Defendants created, maintained and enforced rules and regulations, i.e., *set standards*, which functioned as an anticompetitive restraint.  Plaintiffs allege that the Defendants have done this through the use of standardized listing agreements and contracts for the purchase and sale of pre-owned yachts and boats, establishing a certification program, promulgating codes of ethics and otherwise creating and maintaining the 'ground rules' for how the business of buying and selling pre-owned boats and yachts is done.  The underlying class action is designed to challenge and disrupt the way this business is done.

USLI's policy contains a Standard Setting Exclusion, which excludes coverage for any Claim against the insured *arising out of or in any way involving* "accreditation", "certification" "standard setting" or similar such activities by the insured.  The Florida Supreme Court has held that the words "arising out of" in an insurance policy are unambiguous and absolute in scope. *Taurus Holdings, Inc. v. U.S. Fidelity & Guar. Co.*, 913 So. 2d 529, 532-33 (Fla. 2005).  In *Taurus Holdings*, the Court recognized that "[t]he term 'arising out of' is broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.'" *Id.* Thus, applying the definition of "arising out of" in *Taurus Holdings* to the Policy language here, the sole issue before this Court is

whether the claims alleged against IYBA originated from, grew out of, flowed from, or merely *had a connection with* any of the excluded activities. USLI submits that they did.

There are no reported decisions in Florida or anywhere else which have addressed or analyzed this exclusion. However, the exclusion is not ambiguous and it applies under the facts that have been alleged here. The exclusion refers to "accreditation", "certification" and "standard setting" as well as similar such activities. Although these terms are note separately defined in the Policy, they are not ambiguous.

The term "standard setting" in particular is not ambiguous. "Standard' is a common descriptive word connoting stability, general recognition and conformity to established practice." *Black's Law Dictionary, 5th Ed.*, *citing Standard Accident Ins. Co. v. Standard Surety & Casualty Co.*, 53 F.2d 119 (S.D.N.Y. 1931). The American Heritage Dictionary, 4th Ed., defines "standard" to include "something, such as a practice or a product, that is widely recognized or employed, especially because of its excellence." The definition of "setting" includes "The context and environment in which a situation is set; the background." *The American Heritage Dictionary, 4th Ed*. Thus, setting a standard or "standard setting" is a practice of establishing a set of rules or an industry standard. Put another way, "standard setting" is the establishment of rules and regulations pursuant to which a company or organization conducts its business. And what is the underlying class action if not a challenge to the way defendants, and IYBA in particular, conduct their business? The underlying class action alleges that the manner in which defendants conduct their business, through their rules, certifications, codes of conduct and use of standardized form contracts, is anticompetitive. IYBA's and the other Defendants' alleged standard setting and similar such activities is at the heart of plaintiffs' claims.

Although there are no reported decisions analyzing "standard setting" in the context of a policy exclusion, decisions which have addressed standard setting in the context of claims alleging violations of the Sherman Act provide further support that the underlying class action involves standard setting and are, thus, excluded from coverage under the Policy.

In *SD 3, LLC v. Black & Decker (U.S.) Inc., et al*, 801 F.3d 412 (4th Cir. 2015), the court considered claims that various defendants utilized a standard setting process in a manner which violated the Sherman Act. Plaintiff, SawStop, LLC, created a form of "active injury mitigation technology" ("AIMT"), which was designed to prevent or minimize injuries to users of table-saws. SawStop alleged that various defendants, all of whom where table-saw manufacturers, met during the annual Power Tool Institute trade association meeting and decided to institute a boycott against SawStop. According to SawStop, the defendants "agreed not to purchase technology licenses from [SawStop] or otherwise implement AIMT."

After failing to convince any of the manufacturers to enter into a licensing agreement with it, SawStop turned to a private safety-standard-setting organization, Underwriters Laboratories, Inc. ("UL"), to advance the AIMT product. SawStop submitted a proposal to UL suggesting that the organization modify its widely accepted safety standards to require AIMT on all table saws. The proposal was referred to UL's Standards Technical Panel 745 ("STP 7545"), where it was rejected. Plaintiff alleged that STP 745's rejection of plaintiff's proposal was the result of a conspiracy between the defendants and STP 745, which was allegedly "under the firm control of the Defendants." The Court's discussion of standard-setting conspiracies is helpful in understanding what "standard-setting" is, which is at the heart of this coverage dispute:

> Standard-setting organizations are voluntary membership organizations whose participants develop "technical specifications to ensure that products

> from different manufacturers are compatible with each other," address certain threshold safety concerns, or serve other beneficial functions. *Microsoft Corp. v. Motorola, Inc.,* 696 F.3d 872, 875 (9th Cir. 2012). These organizations have enjoyed a rather complicated relationship with antitrust law. "[M]embers of such associations often have economic incentives to restrain competition and the product standards set by such associations have a serious potential for anticompetitive harm." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500, 108 S. Ct. 1931, 100 L. Ed. 2d 497 (1998); see also *Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 571, 102 S. Ct. 1935, 72 L. Ed. 2d 330 (1982). As a result, "private standard-setting associations have traditionally been objects of antitrust scrutiny." *Allied Tube*, 486 U.S. at 500. …
>
> Courts have found standard-setting organizations and their members to have violated the antitrust laws in some cases, but those cases are relatively few and far between. Of most relevance here, "an entity may be prosecuted for an antitrust violation on the basis of improper coercion of a standards-setting body." *Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010). *Allied Tube* is the oft-cited example of that concept. In that case, the defendant deliberately packed a standard-setting panel with paid supporters who then banned a competing product. *Allied Tube,* 486 U.S. at 496. *Coalition for ICANN Transparency* is another example. There, the Ninth Circuit found potential antitrust liability when a powerful corporation allegedly used vexatious litigation and financial pressure to coerce a standards organization into providing advantages to that defendant. *Coalition for ICANN Transparency*, 611 F.3d at 501, 506.
>
> The common thread in the few cases finding liability in the private standard-setting context is unique, external pressure applied to achieve an anti-competitive end. "[T]he principal concern has been the use of standards setting as a predatory device . . . ; normally there is a showing that the standard was deliberately distorted by competitors of the injured party, sometimes through lies, bribes, or other improper forms of influence, in addition to a further showing of market foreclosure." *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 57-58 (1st Cir. 1999). In other words, a plaintiff must ordinarily show that the standard-setting activity had a market-closing effect that was committed "through the use of unfair, or improper practices or procedures." *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 488 (1st Cir. 1998) (Breyer, J.).

At 47-48.

In *In re German Automotive Manufacturers Antitrust Litigation*, 392 F.Supp.3d 1059 (N.D. Ca. 2019), a California district court discussed standard-setting in the context of Sherman Act claims.  That litigation involved two class actions which were filed by consumers and auto dealers against the five leading German car manufacturers - Audi, BMW, Daimler, Porsche and Volkswagen and their American subsidiaries. The class actions alleged that defendants have colluded to restrain trade in violation of the Sherman Act.  Plaintiffs alleged that beginning in the mid-1990's, defendants started intentionally slowing down the pace of innovation. Doing so resulted in defendants' cars having "fewer features and reduced performance."  *Id*., at 1062.  Plaintiffs claimed that defendants took this approach in order "to reduce production costs" and "avoid price and technology wars." *Id*., at 1062.  According to plaintiffs hundreds of sefendants' employees participated in the agreement meeting for decades in dozens of working groups and trade association events.

The district court noted that under the facts alleged by plaintiffs, defendants' collaboration was mostly akin to standard setting:

> an agreement to only use certain technical solutions is not the same as an agreement to reduce product quality. The former may be equivalent to "standard setting," which "serves many useful ends, such as protecting consumers from inferior goods, increasing compatibility among products that must be interchangeable with the products of other manufacturers, or focusing customer comparison on essential rather than nonessential differences." *Areeda & Hovenkamp* ¶ 2136a. For these reasons, "most instances of standard setting . . . are lawful." *Id.* It is not appropriate to infer that Defendants reached a per se illegal agreement to reduce product quality, which is what Plaintiffs allege, simply because they agreed to exchange "competitively sensitive technical data" and to use "only certain technical solutions."

*Id*, at 1070-71.

"Private standard-setting associations have traditionally been objects of antitrust scrutiny." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500-01, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). Sometimes such ventures can have "decidedly procompetitive effects." *SD3*, supra, at 435. Other times, standard-setting may have "a marker-closing effect that was committed 'through the use of unfair, or improper practices or procedures.'" *SD3*, at 436, *citing Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 488 (1st Cir. 1998).

The underlying *YA MON* class action involves precisely the sort of standard-setting and similar activities which plaintiffs clam violates the Sherman Act. According to the *YA MON* complaint, the Defendants and their co-conspirators "together control the market for the purchase and sale of pre-owned boats and yachts." (Par. 8. *YA MON* Complaint). "A market in which sales power is concentrated in the hands of the few can also facilitate coercion." *SD3*, supra at 432. *See also Allyn v. Am. Bd. of Med. Specialties, Inc.*, 2019 WL 297459 (M.D. Fla. Jan. 3, 2019) *citing American Soc'y of Mechanical Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 570-71, 102 S. Ct. 1935, 72 L. Ed. 2d 330 (1982) (recognizing that standard setting organization can be liable under the Sherman Act where the organization "wields great power in the Nation's economy").

It is this alleged control of the market which allowed the Defendants to establish rules and regulations, in other words, to *set standards*, that have the effect of stifling competition. Coverage for such conduct is excluded under USLI's standard setting exclusion, which is not limited solely to standard setting, but extends to "similar such activities."

Under settled Florida law, courts may not "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So.2d 1245, 1248 (Fla 1986). If a policy provision is clear and

unambiguous, as it is here, it should be enforced according to its terms. *Taurus Holdings, Inc. v. United States Fidelity & Guaranty Co.*, 913 So.2d 528, 532 (Fla. 2005). USLI submits that its Standard Setting Exclusion is unambiguous and, applied as written, excludes coverage for the claims which have been alleged against IYBA in the underlying *YA MON* class action.

## CONCLUSION

WHEREFORE, Plaintiff, UNITED STATES LIABILITY INSURANCE COMPANY, respectfully requests this Court to grant its Motion for Summary Final Judgment declaring that USLI has no duty to defend or indemnify Defendant, INTERNATIONAL YACHT BROKER'S ASSOC. INC., in the underlying *YA MON* Class Action.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion for Summary Final Judgment was served by CM/ECF System this **30th day of September, 2024**, which provides an E-notification to all Parties on the E-Service List as shown below.

**HINSHAW & CULBERTSON, LLP**

By: *Gary Khutorsky*
Gary Khutorsky, Esq. (FBN 814271)
gkhutorsky@hinshawlaw.com
Stephanie H. Carlton, Esq. (FBN 123763)
scarlton@hinshawlaw.com
201 East Las Olas Blvd., Suite 1450
Ft. Lauderdale, FL 33301
Tel: 954-467-7900
Fax: 954-467-1024
*Attorneys for Plaintiff, United States Liability Insurance Company*

11924\322551421.v1