**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-22897-CIV-GAYLES/D'ANGELO**

**UNITED STATES LIABILITY**
**INSURANCE COMPANY,**

      **Plaintiff,**

**vs.**

**INTERNATIONAL YACHT**
**BROKER'S ASSOCATION INC.,**

      **Defendant.**

_____/

**OMNIBUS REPORT AND RECOMMENDATION GRANTING**
**PLAINTIFF'S MOTION FOR FINAL SUMMARY JUDGMENT AND**
**DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**THIS CAUSE** is before the Court on two motions: (1) Plaintiff United States Liability

Insurance Company's Motion for Final Summary Judgment filed on September 30, 2024 (DE 15),

and (2) Defendant International Yacht Brokers Association Inc.'s Motion for Partial Summary

Judgment on the Duty to Defend filed on October 28, 2024 (DE 23).[1]  As to Plaintiff's Motion for

Final Summary Judgment, Defendant responded in opposition on October 29, 2024 (DE 27), and

Plaintiff replied on November 14, 2024 (DE 32).  As to Defendant's Motion for Partial Summary

Judgment, Plaintiff filed its opposition on November 14, 2024 (DE 33), and Defendant filed its

reply on December 4, 2024 (DE 37).  The Court held oral arguments on the Motions on July 31,

2025 (DE 56).  Having considered the Parties' arguments in the briefing and at oral arguments, the

relevant legal authorities, and the pertinent portions of the record, and being otherwise fully

advised in the premises, for the reasons stated below, it is respectfully recommended that

---

[1] On January 15, 2025, this case was referred to the undersigned Magistrate Judge for all pre-trial,
non-dipositive matters and for a Report and Recommendation on any dispositive matters (DE 44).

Plaintiff's Motion for Final Summary Judgment be **GRANTED** and Defendant's Motion for Partial Summary Judgment be **DENIED**.

## I.   <u>BACKGROUND</u>

This case involves a dispute over an insurance policy's coverage that Plaintiff United States Liability Insurance Company issued to Defendant International Yacht Brokers Association Inc. Defendant is "the world's largest and most influential association for the yacht brokerage and charter industry" (DE 16 ¶ 2; DE 22 ¶ 2).  Defendant purchased a non-profit management liability policy, number NDO1579632E, for the period of March 1, 2024 to March 1, 2025 (DE 24 ¶ 1; DE 34 ¶ 1).  Among other things, the policy provided for Plaintiff to pay defense costs related to claims brought against Defendant that fall within the terms of the policy (DE 24 ¶ 2; DE 34 ¶ 2).  On March 28, 2024, Defendant was served with a complaint in federal court for violations of antitrust laws, which are described in further detail below (DE 24 ¶ 8; DE 34 ¶ 8).  Defendant timely provided written notice to Plaintiff of the claims, seeking coverage under the insurance policy (DE 24 ¶ 12; DE 34 ¶ 12).  Plaintiff subsequently filed the instant action, seeking a declaratory judgment that it has no duty to defend or indemnify Defendant in the underlying action for antitrust violations (DE 24 ¶ 13; DE 34 ¶ 13).  The ensuing facts are not disputed by the Parties.

### A.  The Insurance Policy

The insurance policy that Plaintiff issued to Defendant contains the following coverage for directors and officers: "The **Company** will pay, on behalf of the **Organization**, **Loss** and **Defense Costs** resulting from a Claim first made against the **Organization** during the **Policy Period**, or Extended Reporting Period, if applicable."  (DE 24 ¶ 2; DE 34 ¶ 2 (emphasis original)).  A Claim is defined in the policy as, among other things, any "civil proceeding commenced by service of a complaint or similar pleading . . . received by, or brought or initiated against any **Insured** alleging

a **Wrongful Act**, including any appeal therefrom" (DE 24 ¶ 3; DE 34 ¶ 3 (emphasis original)).

Wrongful Acts include, in relevant part, any "actual or alleged act, error, omission, misstatement,

misleading statement, neglect, or breach of duties . . . committed or allegedly committed by: a. the

**Organization**" (DE 24 ¶ 4; DE 34 ¶ 4 (emphasis original)).  The policy states that Plaintiff "shall

have the right and duty to defend any **Claim** covered by this **Policy** even if the allegations are

groundless, false or fraudulent" (DE 24 ¶ 5; DE 34 ¶ 5 (emphasis original)).  "If a **Claim** is made

against an **Insured** for both **Loss** that is covered by this **Policy** and loss that is not covered by this

**Policy**, [Plaintiff] will pay as follows: 1. One hundred percent (100%) of **Defense Costs** on account

of such **Claim**" (DE 24 ¶ 6; DE 34 ¶ 6 (emphasis original)).

The policy contains several exclusions from coverage located in Section IV, Subsection A

(DE 16 ¶ 4; DE 22 ¶ 4).[2]  In that section, there is an "**ACCREDITATION/CERTIFICATION/**

**STANDARD SETTING EXCLUSION**" that was added by endorsement, which states:

### IV. EXCLUSIONS

A. [Plaintiff] shall not be liable to make payment for **Loss** or **Defense Costs** in connection with any **Claim** made against the **Insured** arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

**ACCREDITATION/CERTIFICATION/STANDARD SETTING EXCLUSION**

It is hereby agreed that the Directors and Officers Coverage Part, Section IV, EXCLUSIONS, Subsection A, is amended by the addition of the following:

Accreditation/Certification/Standard Setting

accreditation, certification, standard setting, or similar such activities by or on behalf of any **Insured**; . . . .

---

[2] Rather than using continuous numbers, Plaintiff's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment renumbers each section (*see generally* DE 16).  To correspond to Plaintiff's filing, Defendant's response does the same (*see generally* DE 22).  This citation refers to paragraph 4 in the "USLI's Policy" section.

(DE 16 ¶ 4; DE 22 ¶ 4 (emphasis original)).  The Parties do not dispute the existence of the insurance policy at the time Defendant sought coverage or that Defendant properly filed a claim for coverage.  Additionally, the Parties agree that the relevant policy language governing their dispute is the language set forth above.

### B.  The Underlying Case for which Defendant Seeks Coverage

On March 28, 2024, Defendant was served with a class action complaint in *Ya Mon Expeditions, LLC, et al. v. International Yacht Brokers Association, Inc., et al.*, No. 24-CIV-20805 (S.D. Fla. Feb. 29, 2024) (DE 24 ¶ 8; DE 34 ¶ 8).  On June 10, 2024, the original complaint was superseded by a Consolidated Class Action Complaint ("the Underlying Complaint") (DE 24 ¶ 8; DE 34 ¶ 8).  The Underlying Complaint alleges Defendant and other co-conspirators violated federal antitrust laws (DE 24 ¶ 9; DE 34 ¶ 9).  Specifically, Count I of the Underlying Complaint alleges Defendant violated Section 1 of the Sherman Act, Title 15, United States Code, Section 1 by "requir[ing] yacht sellers to pay artificially inflated broker commissions and eliminate competition" (DE 24 ¶ 10; DE 34 ¶ 10).  Count II alleges Defendant violated Section 1 of the Sherman Act by refusing to deal with unrepresented sellers, making it "virtually impossible for the owner of a large boat or yacht to obtain access to the market in order to sell it without the use of a broker, and paying the brokers' commissions" (DE 24 ¶ 11; DE 34 ¶ 11).

The gravamen of the claims asserted in the Underlying Complaint is that Defendant, and others, committed antitrust violations by "agreeing, combining, and conspiring to adopt, impose, and enforce an anticompetitive restraint that, as a condition for selling their yachts, requires pre-owned yacht sellers to pay a supracompetitive [sic] total aggregate commission fee that includes an inflated brokerage fee for the buyer's broker" (DE 16 ¶ 3; DE 22 ¶ 3).  In describing Defendant's supposed role in the antitrust violations, the Underlying Complaint states the following, in part:

7. Most larger boats and yachts sold on the MLS[3] are subject to standard listing agreements (e.g., a "Central Listing Agreement"), whereby the prospective seller of a yacht grants a particular broker the exclusive right to sell the yacht.

9. Central Listing Agreements are standardized forms with terms and conditions provided by national trade associations, including [Defendant] . . . for boat brokers to use. Those agreements generally require the seller's broker to make a non-revocable offer of compensation, referred to at times as a "co-brokerage agreement," to the buyer's broker . . . .

10. Some of the MLS were founded or are owned by yacht broker associations. Others are independent. However, if the independently owned MLS want to obtain listings from brokers, they must conform to industry practice at the insistence of boat brokers, who are also members of the yacht broker associations. Therefore, in either case, the boat brokerage firms, whether through their membership in and influence on the yacht broker associations or through their participation in the MLS, have contributed to the creation and maintenance of an anticompetitive agreement that establishes the ground rules for the sale of a substantial number of pre-owned boats and yachts on the MLS owned or operated by Defendants. As a result of that anticompetitive agreement, boat owners who sell their boats through participating [in the] MLS end up paying the buyer's broker as part of a commission rate, and also pay an overall commission fee that is inflated and arbitrarily tied to the purchase price.

13. The upshot is twofold: (a) yacht broker associations and brokers have conspired to create, impose, enforce, and maintain rules that require boat and yacht owners to sign a listing agreement by which they agree to pay a commission to buyers' brokers as part of those listing agreements in order to sell their boats and yachts; and (b) sellers of pre-owned boats and yachts pay overall commissions at an inflated rate higher than they would absent the anticompetitive conduct alleged herein and pay a commission to the buyer's broker.

47. [Defendant] touts that it has 'more than 2000+ members and growing' and is 'the world's largest and most influential association for the yacht brokerage & charter industry.' [Defendant], through its own legislative affairs program, advocates for the interests of yacht brokers. In 1987, [Defendant] was 'founded by a coalition of yacht brokerage business owners in South Florida.' In 2013, [Defendant] introduced standardized contracts for the transaction of yacht sales.

52. Purportedly in order to create uniformity in pre-owned yacht brokerage industry sales practices, YBAA, in partnership with [Defendant] and additional yacht broker associations, established the Certified Professional Yacht Broker ("CPYB")

---

[3] The Underlying Complaint explains that "MLS" is an abbreviation for multiple listing services, which are "databases created for boat brokers to share their listings on a single platform . . . [and] facilitate information sharing among prospective buyers, sellers, and brokers . . ." (DE 1-1 ¶ 4).

certification program, which is used throughout the United States. The certification program is administered by YBAA in partnership with [Defendant], NYBA, and CYBA, among other broker and marine trade associations. To obtain certification under the program requires, inter alia, an agreement to conduct all business in compliance with the CPYB Code of Ethics, among other obligations. Uniform CPYB standards, including the seller-pays-the-buyer's-broker requirement and other standardized forms, are contained in program materials entitled, The Guide for the Professional Practice of Yacht Brokerage & Sales (YBAA 2020 ed.)

83. Defendants have conspired to boost buyers' brokers' commission rates and total commission rates above a competitive level and have strived to maintain those inflated rates through numerous actions. Among other things, they have enacted anticompetitive rules through MLS and influential trade associations composed of yacht brokers who should be competing with one another but, instead, cooperate with each other to the detriment of pre-owned boat sellers.

88. [Defendant's] rules also direct brokers to cooperate with one another, even though their clients have diametrically competing interests.

89. Its bylaws, for example, provide the purpose of [Defendant] is '[t]o unite those engaged in the yacht brokerage business for the purpose of promoting cooperation and professionalism among its members.'

90. Similarly, [Defendant's] Code of Ethics, which are part of [Defendant's] bylaws, state:

> Section 17. Members should cooperate with other members on vessels listed with him whenever it is in the interest of the client. Negotiations concerning a vessel listed exclusively with one member should be carried on with the listing broker, not the owner, except with the express consent of the listing member. All shared commission agreements should be negotiated prior to the submission of any Offer to Purchase.

91. The ethical rules also prohibit brokers from competing with one another in certain ways:

> Section 15. Members should not advertise other members' listings without their permission. Prices advertised on other members' listings should not be other than the listed offering price.
>
> * * *
>
> Section 18. The agency of a member who holds an exclusive or central listing should be respected. A member cooperating with the listing member should not invite the participation of a third party without the express consent of the listing Broker.

92. [Defendant] provides a model Central Listing Agreement that specifies the seller is solely responsible for the broker's commission. [Defendant] added that provision to the Purchase and Sale Agreement ("PSA") so that a broker can point to paragraph 5 of the PSA and reassure the buyer.

93. Significantly, [Defendant's] rules specify the commission split should be "negotiated [between the brokers] prior to the submission of any Offer to Purchase" thereby precluding buyers from making an offer to purchase a yacht for a reduced price by reducing the commission paid to the buyer's broker. . . .

125. The yacht broker associations, including [Defendant], can impose significant penalties on members who do not comply with their rules, including rules about cooperating with competing brokers.

131. Broker Defendants joined, furthered, and maintained the conspiracy alleged here in multiple ways, including at minimum, by: (a) having their executives participate in Yacht Broker Association Defendants, including those associations' adoption, maintenance, and enforcement of the rule that sellers pay buyers' commissions; (b) requiring their broker employees to comply with the anticompetitive Yacht Broker Association Defendants' rules, including the rule that sellers pay buyers' commissions; (c) having their executives promulgate and/or enforce the anticompetitive rules adopted by the MLS; (d) having their employees join, or be accredited by, Yacht Broker Association Defendants; and (e) listing yachts for sale on MLS such as YATCO, YachtBroker.org, and Yacht World.

160. The Brokerage Defendants . . . conspired with Yacht Broker Association Defendants to implement, comply with, and enforce the . . . Associations' rules, including their anticompetitive rules, in furtherance of their conspiracy.

(DE 16 ¶ 7; DE 22 ¶ 7 (footnotes omitted)).  Ultimately, the Underlying Complaint claims that

Defendant, as a yacht broker association, conspired with others purportedly to:

(a) participate[] in the establishment, implementation, and enforcement of the anticompetitive rules of Yacht Broker Association Defendants and other yacht broker associations, including, but not limited to, required payment by sellers of commissions to the buyer's broker; (b) participate[] in the establishment, implementation, and enforcement of the anticompetitive rules of YATCO and YachtWorld, including, but not limited to, the required payment by sellers of commissions to the buyer's broker; and (c) include[] provisions in the policy manuals and other corporate agreements that require their brokers to comply with the Codes of Conduct of Yacht Broker Association Defendants, and other yacht broker associations, and abide by and enforce the requirement that sellers pay commissions to the buyer's broker.

(DE 1-1 ¶ 200).

### C.  Procedural Posture

On July 30, 2024, Plaintiff filed this lawsuit against Defendant (DE 1).  Plaintiff brings two counts: (1) a claim for a declaratory judgment, seeking a declaration that Plaintiff has no duty to defend or indemnify Defendant for any claims in the Underlying Complaint, and (2) a claim for reimbursement of defense fees if it is determined that Plaintiff has no duty to defend Defendant (*id.* at 10-11).  On September 9, 2024, Defendant filed its Answer and Counterclaim to Plaintiff's Complaint (DE 13).  Defendant asserts a breach of contract claim against Plaintiff, contending that Plaintiff "has a right and a duty to defend any Claim, including the underlying [class action]" (*id.* ¶ 23).  On September 30, 2024, Plaintiff filed its Motion for Final Summary Judgment, arguing that it has no duty to defend or indemnify Defendant in the antitrust case, because the accreditation, certification, and standard setting exclusion applies to exclude coverage (DE 15 at 12).  On October 28, 2024, Defendant moved for Partial Summary Judgment, arguing that Plaintiff has a duty to defend Defendant, because the allegations in the Underlying Complaint are not covered by any policy exclusions (DE 23 at 15).  The Parties agree that the Court must interpret the language of the policy and determine whether the exclusion is applicable; therefore, these issues can be appropriately decided on summary judgment.

## II.   <u>LEGAL STANDARD</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "[S]ummary

judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"'If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992)). "When the only question a court must decide is a question of law, summary judgment may be granted." *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011). "The interpretation of a contract, or agreement, presents a question of law, as does the determination of whether a contract is ambiguous." *Id.* (internal citation omitted).

### III.   APPLICABLE LEGAL PRINCIPLES

At the July 31, 2025 hearing, the Parties agreed that "[s]ince our jurisdiction is grounded in diversity, we apply Florida's substantive law." *Westchester Gen. Hosp., Inc. v. Evanston Ins. Co.*, 48 F.4th 1298, 1302 (11th Cir. 2022). The Parties further agreed that Plaintiff owed Defendant a duty to defend against claims that fall within the policy's coverage. The Parties agreed that the policy contains an accreditation/certification/standard setting exclusion, which alleviates Plaintiff from the duty to defend and indemnify, if applicable. Lastly, the Parties agreed that the Court should look to the allegations in the Underlying Complaint to determine whether the claims in that litigation fall within the exclusion, thereby assuaging Plaintiff's duty to defend. From here, the Parties arrive at the central issues in this case – that is, how the accreditation/certification/ standard setting exclusion in the policy should be interpreted as a matter of law and whether the allegations in the Underlying Complaint fall within that interpretation. There is one final point of agreement between the Parties: there are no reported state or federal cases either Party can locate interpreting

language in an insurance policy similar to the exclusion at issue here.  The Court, too, cannot locate any decisions that directly address the interpretation of an accreditation/certification/standard setting exclusion in an insurance policy.  Nevertheless, there is ample guidance from state and federal courts about interpreting insurance contracts generally in accordance with Florida law.

### A.  Construction of Insurance Contracts Under Florida Law

"Under Florida law, interpretation of an insurance policy is a question of law for the court." *Tony v. Evanston Ins. Co.*, 674 F. Supp. 3d 1226, 1230 (S.D. Fla. 2023).  "[I]nsurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000).  "[C]ourts look at the insurance policy as a whole and give every provision its 'full meaning and operative effect." *Trailer Bridge, Inc. v. Illinois Nat. Ins. Co.*, 657 F.3d 1135, 1141 (11th Cir. 2011) (citation omitted).  "[I]f a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005).  Courts should be mindful not to "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 942 (Fla. 1979).

An ambiguity exists when "the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [other] limiting coverage . . . ." *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003).  "Ambiguous policy provisions are interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy."  *Anderson*, 756 So. 2d at 34.  "However, '[o]nly when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction is the rule apposite.'" *State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So. 2d 1245,

1248 (Fla. 1986) (citation omitted); *see also Trailer Bridge, Inc. v*, 657 F.3d at 1141 ("Although ambiguous provisions are construed in favor of coverage, to allow for such a construction the provision must actually be ambiguous." (quoting *Taurus Holdings*, 913 So.2d at 532)).

"[T]he fact that a policy term is undefined does not necessarily mean the term is ambiguous." *State Farm Mut. Auto. Ins. Co. v. Spangler*, 64 F.4th 1173, 1179 (11th Cir. 2023) (citing *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1076 (Fla. 1998)). "Instead, when a policy term is undefined, 'common everyday usage determines its meaning.'" *Id.* (quoting *Nateman v. Hartford Cas. Ins. Co.*, 544 So. 2d 1026, 1028 (Fla. Dist. Ct. App. 1989)). "To find the plain and ordinary meaning of a policy term, courts may 'look to legal and nonlegal dictionary definitions to determine such a meaning.'" *Id.* (quoting *Gov't Emps. Ins. Co. v. Macedo*, 228 So. 3d 1111, 1113 (Fla. 2017)). "Courts are not authorized 'to put a strained and unnatural construction on the terms of a policy in order to create an uncertainty or ambiguity.'" *Land's End at Sunset Beach Cmty. Ass'n, Inc.*, 745 F. App'x at 318 (quoting *Jefferson Ins. Co. of N.Y. v. Sea World of Fla., Inc.*, 586 So.2d 95, 97 (Fla. Dist. Ct. App. 1991)). "The mere fact that an insurance provision is 'complex' or 'requires analysis' does not make it ambiguous." *Id.* (citation omitted)).

### B.  The Duty to Defend

"Under Florida law, the general rule is that an insurance company's duty to defend an insured is determined solely from the allegations in the complaint against the insured, not by the true facts of the cause of action against the insured, the insured's version of the facts or the insured's defenses." *Steinberg*, 393 F.3d at 1230 (citing *Amerisure Ins. Co. v. Gold Coast Marine Distributors, Inc.*, 771 So.2d 579, 580-81 (Fla. Dist. Ct. App. 2000)). "If the allegations in the complaint state facts that bring the injury within the policy's coverage, the insurer must defend regardless of the merits of the lawsuit." *Id.*  (citing *Amerisure Ins.*, 771 So.2d at 580-81). "[A]ny

doubt about the duty to defend must be resolved in favor of the insured." *Id.* (citation omitted). "'[T]he theories advanced and labels used in a complaint are subordinate to the facts alleged for the purpose of determining the duty to defend.'" *Land's End at Sunset Beach Cmty. Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 745 F. App'x 314, 318 (11th Cir. 2018) (quoting *Trailer Bridge, Inc.*, 657 F.3d at 1145). "If the complaint alleges facts partially within and partially outside the scope of coverage, the insurer is obligated to defend the entire suit." *Id.* (citation and quotation omitted).

"If an insurer seeks to avoid a duty to defend because of a policy exclusion, then it 'has the burden of demonstrating that the allegations of the complaint are cast solely and entirely within the policy exclusion, and are subject to no other reasonable interpretation.'" *Mid-Continent Cas. Co. v. Arpin & Sons, LLC*, 261 F. Supp. 3d 1245, 1252 (S.D. Fla. 2017), *aff'd*, 824 F. App'x 644 (11th Cir. 2020) (quoting *Luhman v. Covington Specialty Ins. Co.*, 2017 WL 850178, at *5 (S.D. Fla. 2017)). "With respect to exclusions more specifically, the burden falls on the insurer to prove that an exclusionary clause precludes coverage, and exclusions are construed narrowly." *Royal Palm Optical, Inc. v. State Farm Mut. Auto. Ins. Co.*, 530 F. Supp. 3d 1175, 1180 (S.D. Fla. 2021), *aff'd*, No. 21-11335, 2022 WL 1666967 (11th Cir. May 25, 2022) (citing *U.S. Concrete Pipe Co. v. Bould*, 437 So. 2d 1061, 1065 (Fla. 1983)). "Because the duty to defend is broader than the duty to indemnify, the Florida courts have recognized that a duty to indemnify cannot exist if there is no duty to defend." *Health First, Inc. v. Capitol Specialty Ins. Corp.*, 747 F. App'x 744, 750 (11th Cir. 2018) (citation omitted)).[4]

---

[4] The Parties agreed at the July 31, 2025 hearing that if the Court finds that there is no duty to defend, then there is also no duty to indemnify under the policy.

### IV.   <u>DISCUSSION</u>

In its Motion for Final Summary Judgment, Plaintiff argues that the insurance policy contains an exclusion that eliminates coverage for any claim arising out of "standard setting" or similar activities (DE 15 at 6).  Plaintiff explains that even though "standard setting" is not defined under the policy, this exclusion is not ambiguous.  In turn, the Court can apply the ordinary definitions of "standard" and "setting" to determine the meaning of the exclusion (*id.* at 7).  Once the Court does so, Plaintiff contends that the allegations in the Underlying Complaint plainly fall within the exclusion, because the allegations describe Defendant's role in establishing rules and regulations that have the effect of stifling competition (*id.* at 11).  According to Plaintiff, the standard setting exclusion excludes coverage in the antitrust case; therefore, Plaintiff does not have a duty to defend Defendant in that matter (*id.*).

Defendant counters that Plaintiff's attempt to apply the standard setting exclusion to antitrust allegations "is the proverbial attempt to fit a square peg in a round hole" (DE 27 at 3). Defendant explains that the only reasonable interpretation of the policy's exclusion is that it prevents coverage when Plaintiff "is sued by one or more of its members or applicants seeking to challenge a decision involving accreditation, certification, or association standards" (*id.* at 3-4). According to Defendants, the allegations in the Underlying Complaint cannot be construed as a challenge to a decision involving accreditation, certification, or association standards, so they are not covered by the exclusion (*id.* at 7).  Moreover, Defendant argues that all claims in the Underlying Complaint do not fit solely and entirely within the exclusion, even if some do, which still leads to a duty to defend (*id.* at 11).  Defendant further argues that even if the Court does not accept its asserted interpretation of the exclusion, at a minimum, the language of the exclusion is susceptible to multiple reasonable interpretations and therefore, ambiguous (*id.* at 13).  Since the

exclusion is ambiguous, Defendants claim it must be construed against Plaintiff and in favor of coverage (*id.*).

For Defendant's Motion for Partial Summary Judgment, the Parties largely repeat the same arguments that they advanced with respect to Plaintiff's Motion for Final Summary Judgment. Specifically, Defendant argues that Plaintiff has a duty to defend it in the antitrust case, because a claim was made against Defendant during the policy period that is not covered by an exclusion in the policy (DE 23 at 2-3). Defendant once again asserts its interpretation of the standard setting exclusion and contends that all, or at least some, of the allegations in the Underlying Complaint describe anticompetitive conduct that is not covered by the exclusion (*id.* at 4). Further, Defendant claims that the standard setting exclusion is ambiguous and must be resolved in favor of coverage (*id.* at 4, 11). Plaintiff too reiterates its same arguments that the allegations from the antitrust case fall within the standard setting exclusion, because the allegations show that Defendant created rules and standards for professional yacht brokers, which purportedly served as an anticompetitive restraint (DE 33 at 2). Plaintiff takes issue with Defendant's interpretation of the exclusion, claiming Defendant removes critical language from the exclusion while adding its subjective interpretation (*id.* at 4). Finally, Plaintiff maintains that the exclusion is not ambiguous and is not susceptible to any reasonable interpretation that would preclude its application (*id.* at 6).

### A. The Accreditation/Certification/Standard Setting Exclusion in the Policy

Starting with the language of the exclusion – [Plaintiff] shall not be liable to make payment for Loss or Defense Costs in connection with any Claim made against [Defendant] arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged accreditation, certification, standard setting, or similar such activities by or on behalf of [Defendant] – the Parties focus their arguments the meaning of "standard setting," which is not

defined in the insurance policy.  But, that alone does not render the exclusion ambiguous.  *See Penzer v. Transportation Ins. Co.*, 545 F.3d 1303, 1306 (11th Cir. 2008), *certified question answered*, 29 So. 3d 1000 (Fla. 2010) (explaining that an undefined term in an insurance policy does not render a policy ambiguous (citing *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So.2d 161, 165 (Fla. 2003))).  "[W]hen a policy term is undefined, 'common everyday usage determines its meaning.'" *Spangler*, 64 F.4th at 1179 (citation omitted).  "To find the plain and ordinary meaning of a policy term, courts may 'look to legal and nonlegal dictionary definitions to determine such a meaning.'" *Id.* (citation omitted).

Plaintiff urges the Court to turn to the dictionary, legal and nonlegal, to discern the meaning of "standard setting" within the policy exclusion.[5]  According to Plaintiff,

> ''Standard' is a common descriptive word connoting stability, general recognition and conformity to established practice.' Black's Law Dictionary, 5th Ed., citing Standard Accident Ins. Co. v. Standard Surety & Casualty Co., 53 F.2d 119 (S.D.N.Y. 1931). The American Heritage Dictionary, 4th Ed., defines 'standard' to include 'something, such as a practice or a product, that is widely recognized or employed, especially because of its excellence.' The definition of 'setting' includes 'The context and environment in which a situation is set; the background.' The American Heritage Dictionary, 4th Ed.

(DE 15 at 7).  In sum, Plaintiff contends that "'standard setting' is a practice of establishing a set of rules or an industry standard.  Put another way, 'standard setting' is the establishment of rules and regulations pursuant to which a company or organization conducts its business" (*id.*).  "This meaning, derived from dictionary definitions, comports with the term's plain meaning as it would be understood by a person on the street." *Spangler*, 64 F.4th at 1180.

Moreover, although no courts have interpreted this language in an insurance policy, there are decisions in the antitrust context that discuss the standard setting function of professional

---

[5] The Parties' arguments focus exclusively on the meaning of "standard setting."  They do not contest the meaning of "accreditation" or "certification" as those terms appear in the exclusion.

associations, such as Defendant.  For example, a treatise on antitrust issues in the healthcare field

describes standard setting programs as follows:

> Competitors frequently establish and control standard-setting programs for their
> products and services. Intended to benefit the public by helping to ensure quality
> and safety, this form of self-regulation can also generate serious anticompetitive
> effects by excluding firms or products from the market. In general, standard-setting
> programs can involve establishment of specifications that products [or services] of
> sellers should meet and, sometimes, related certification or accreditation programs,
> certifying that the products [or services] meet the agreed-upon standards. The
> program . . . may be private, operated by a trade association or standard-setting
> organization (SSO) (in which members of the industry establish their own standards
> or in which independent standard-setting or testing firms set standards . . .). The
> program may or may not include . . . enforcement mechanisms[] and certification
> procedures.

§ 4:10. Standard-Setting Programs, 1 Health Care and Antitrust L. § 4:10 (2025).  Antitrust cases

involving allegations against professional associations describe the associations' standard setting

functions in a similar manner.  *See, e.g.*, *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412,

435 (4th Cir. 2015) ("Standard-setting organizations are voluntary membership organizations

whose participants develop 'technical specifications to ensure that products from different

manufacturers are compatible with each other,' address certain threshold safety concerns, or serve

other beneficial functions." (citation omitted));[6] *ECOS Elecs. Corp. v. Underwriters Lab'ys*, 743

F.2d 498, 503 (7th Cir. 1984) (describing a standard setting association as "[a]n association formed

to foster high standards, to mitigate evils in trade existing through lack of knowledge or

information, and to encourage fair competitive opportunities"); *Allied Tube & Conduit Corp. v.

Indian Head, Inc.*, 486 U.S. 492, 500 (1988) (discussing the pro-competitive and anti-competitive

effects of the standard-setting process of a private association); *Poindexter v. Am. Bd. of Surgery,

Inc.*, 911 F. Supp. 1510, 1519 (N.D. Ga. 1994) ("Courts have long recognized that establishing

---

[6] Standard setting associations may focus on products or services, depending on the industry.  That
distinction has no real import for purposes of understanding the term "standard setting."

and monitoring product and service standards is a legitimate and beneficial function of trade and professional associations. . . . '[R]estrictions on access by imposition of educational and training requirements and a degree of self-regulation are definitional aspects of the term 'profession.''" (citation omitted)).

Notably, courts' discussions of professional associations' standard setting function in antitrust cases comport with the dictionary definition of "standard" and "setting," as discussed above. We therefore arrive at the plain meaning of "standard setting" as an ordinary person would understand it: setting forth standards of practice for the performance of services in an industry. The fact that "standard setting" is placed along side "certification" and "accreditation" in the exclusion only reinforces this conclusion. The dictionary defines "accreditation" as "the granting of approval to an institution of learning by an official review board after the school has met specific requirements." The American Heritage Dictionary, 4th Ed. "Certification" means "to guarantee as meeting a standard." *Id.* All three terms invoke the use of standards, or a general acceptance of and conformity with established practice, through education, training, or professional agreement as to the established manner for performance in the industry. Reading the provisions of the policy as a whole, as the Court must, the meaning of standard setting comes into focus. *See E.S.Y., Inc. v. Scottsdale Ins. Co.*, 139 F. Supp. 3d 1341, 1351 (S.D. Fla. 2015) ("[T]he insurance policy is read as a whole, with the Court endeavoring to give each provision its full meaning and operative effect.").

Defendant offers an alternative interpretation of standard setting: "The only reasonable interpretation is that the exclusion bars coverage when [Defendant] is sued by one or more of its members or applicants seeking to challenge a decision involving accreditation, certification, or association standards" (DE 27 at 3-4). Only this interpretation does not set out to define standard

setting; Defendant, instead, offers a factual scenario under which it argues the exclusion applies while parroting back the language of the exclusion itself.  In offering this interpretation, Defendant really questions the breadth of the exclusion, not the meaning of standard setting, which Defendant seemingly defines as the setting of association standards – a definition that is less precise, but consistent with, that provided by the dictionary.  Put differently, Defendant's argument begs the question: is a challenge to decisions involving accreditation, certification, or association standards all the exclusion covers?  And even Defendant conceded at the July 31, 2025 hearing that there is nothing in the policy to suggest a claim must be brought by an association member or applicant to fit within the exclusion.  *See Trailer Bridge, Inc.*, 657 F.3d at 1141 (explaining that courts may not rewrite a contract or add meaning that is not present, or otherwise reach a result contrary to the parties' intentions).

Defendant further contends that because it offered an alternative reasonable interpretation of the exclusion, the policy's language is ambiguous.  Indeed, "[p]olicy language is considered to be ambiguous . . . if the language 'is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage.'"  *Washington Nat. Ins. Corp. v. Ruderman*, 117 So. 3d 943, 948 (Fla. 2013).  But, the exclusion's language is not ambiguous.  As already discussed, "[l]anguage is not ambiguous merely because the policy fails to define a term, or because the parties disagree about its meaning."  *Archer W. - De Moya Joint Venture v. Ace Am. Ins. Co.*, 713 F. Supp. 3d 1260, 1275 (S.D. Fla. 2024).  Defendant does not contend that "accreditation" and "certification" are ambiguous, though undefined in the policy.  As described above, the ordinary meaning of "standard" and "setting" in the dictionary give effect to "standard setting," while reading it conjunction with the rest of the exclusion.  *See Goldberg v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 143 F. Supp. 3d 1283, 1295 (S.D. Fla. 2015) ("[T]he exclusion is

'clear and plain, something only a lawyer's ingenuity could make ambiguous.'" (citation omitted)). Defendant has not offered any reasonable meaning to the contrary, notwithstanding its dispute about what is and is not covered by the exclusion.  Since there is no ambiguity in the exclusion's language, the Court turns to its applicability to the claims in the Underlying Complaint.

### B.  Plaintiff's Duty to Defend Under the Policy

"If an insurer seeks to avoid a duty to defend because of a policy exclusion, then it 'has the burden of demonstrating that the allegations of the complaint are cast solely and entirely within the policy exclusion, and are subject to no other reasonable interpretation.'" *Luhman*, 2017 WL 850178, at *5 (citations and emphasis omitted).  Importantly, "if the [underlying] complaint alleges facts showing two or more grounds for liability, one being within the insurance coverage and the other not, the insurer is obligated to defend the entire suit." *Lime Tree Vill. Cmty. Club Ass'n, Inc. v. State Farm Gen. Ins. Co.*, 980 F.2d 1402, 1405 (11th Cir. 1993) (quoting *Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.,* 470 So.2d 810, 813-14 (Fla. Dist. Ct. App. 1985) (emphasis removed)).  "All doubts as to whether a duty to defend exists are resolved against the insurer and in favor of the insured." *Trizec Props., Inc. v. Biltmore Const. Co.*, 767 F.2d 810, 812 (11th Cir. 1985).  The Parties agreed at the July 31, 2025 hearing that the Court should only look to the face of the Underlying Complaint in the antitrust case to determine whether the claims brought in that litigation are excluded from coverage.  *See Higgins v. State Farm Fire & Cas. Co.*, 894 So. 2d 5, 10 (Fla. 2004) ("[A]n insurer's obligation to defend is determined solely by the claimant's complaint if suit has been filed.").  Against the backdrop of these long-established principles, the Court turns to the facts and theories established in the Underlying Complaint to determine whether Plaintiff has a duty to defend Defendant in that matter.

The Underlying Complaint alleges that Defendant and its co-conspirators control the market for the purchase and sale of pre-owned boats and yachts and use this purported influence to require sellers to pay inflated brokerage costs that are higher than they would be in a competitive market (DE 1-1 ¶ 8).  To achieve this scheme, Defendant and others supposedly (i) encourage brokerage executives to participate in professional associations, like Defendant, "including those associations' adoption, maintenance, and enforcement of the rule that sellers pay buyers' commissions," (ii) require association members to comply with their rules, (iii) "promulgate and/or enforce the anticompetitive rules adopted by the MLS," and (iv) encourage brokers to join, or be accredited by, professional associations, like Defendant, and list yachts for sale on the MLS (*id.* ¶ 131).  Defendant and others allegedly own some of the MLS, which only allow brokers to list, and require listers to use a standard listing agreement, such as the Central Listing Agreement, thereby giving Defendants and others "unchecked power to require boat and yacht sellers to pay inflated brokerage costs" (*id.* ¶¶ 6-10).  The main crux of the claims against Defendant is that it, along with others, allegedly "enacted anticompetitive rules" that direct brokers, who should be competing with one another, to cooperate to the detriment of pre-owned boat sellers and subject those who do not comply to "disciplinary action, including potential expulsion" (*id.* ¶¶ 83, 106).  The resounding theme is that Defendant participated in and furthered the conspiracy by "promulgat[ing] and enforc[ing] anticompetitive rules, including that sellers pay buyers' commissions, . . . by requiring their members to comply with such rules" (*id.* ¶ 148).

Defendant argues that the accreditation/certification/standard setting exclusion cannot serve as a bar to coverage for Sherman Act claims, as "the words 'antitrust,' 'Sherman Act,' 'conspiracy,' 'restraint of trade,' 'price fixing,' and 'unfair competition' appear nowhere in the exclusion" (DE 27 at 12).  Defendant further points out that if Plaintiff "wanted to exclude from

coverage any claims arising out of antitrust violations, it could have included a specific antitrust exclusion in the [p]olicy" (*id.*).    Defendant, however, glaringly overlooks the introductory language to the exclusion, which the Parties agreed at the July 31, 2025 hearing is applicable: Plaintiff "shall not be liable to make payment for Loss or Defense Costs in connection with any Claim made against the Insured *arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged* accreditation, certification, standard setting, or similar such activities by or on behalf of any Insured."  Florida courts have repeatedly recognized the sweeping nature of this language.  *See Westchester Gen. Hosp., Inc.*, 48 F.4th at 1303 ("[T]he 'in any way involving' language is extremely broad in scope, and it indicates that the provision applies to any claim even remotely involving [the exclusion it modifies]."); *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1275 (11th Cir. 2008) ("The Florida Supreme Court held that the phrase 'arising out of' is *not* ambiguous and should be interpreted broadly." (citing *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 539 (Fla. 2005))).  "[T]he term 'arising out of' is broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.'" *Taurus*, 913 So. 2d at 539.  "To have arisen out of something, there must be 'some causal connection, or relationship' that is 'more than a mere coincidence' but proximate cause is not required." *James River*, 540 F.3d at 1275 (citation omitted).

Looking at the exclusion with its introductory language, then, it requires only that the claims against Defendant have some connection, or nexus, to accreditation, certification, standard setting, or similar such activities.  When viewing the allegations in the Underlying Complaint through this lens, it is hard to see how the allegations are not connected to standard setting.  The Underlying Complaint reiterates in paragraph after paragraph that the professional associations,

like Defendant, used their influence and members to establish, implement, and enforce anticompetitive rules and standards that resulted in a market where sellers are required to pay artificially inflated brokerage costs.  In fact, the claims in the Underlying Complaint depend on Defendant's functions as an entity that accredits, certifies, and sets standards of practice for the performance of brokerage services in boat and yacht sales.  *See id.* (finding pollution exclusion containing "arising out of" language applied where claims depended upon the existence of the environmental contamination); *Horn v. Liberty Ins. Underwriters, Inc.*, 998 F.3d 1289, 1296 (11th Cir. 2021) (holding the phrase "arising out of'" was "crucial" to the court's analysis based on "the Florida Supreme Court's broad interpretation of the phrase"); *see also Zucker for BankUnited Fin. Corp. v. U.S. Specialty Ins. Co.*, 856 F.3d 1343, 1350 (11th Cir. 2017) ("Decisions of the Florida Supreme Court, the Florida Courts of Appeal, and this Court show that the 'arising out of' standard is not difficult to meet.").  True, the exclusion itself does not state that it covers antitrust or price-fixing claims; but, it does cover claims with allegations that are causally linked to Defendant's capabilities as a standard setting association.  *See Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1139 (Fla. 1998) ("[W]e cannot place limitations upon the plain language of a policy exclusion simply because we may think it should have been written that way.").  Here, the facts and legal theories in the Underlying Complaint describe how Defendant and its co-conspirators *used* Defendant's capabilities as a standard setting association, among other tools, to create an unreasonable restraint on trade, leading to the alleged antitrust violations.  These allegations fall within the reach of the exclusionary language.

Next, Defendant contends that even if Plaintiff has shown that some of the allegations fall within the exclusionary language, Plaintiff has not shown that *all allegations* fit entirely and solely within the exclusion, resulting in a duty to defend.  After several opportunities at the July 31, 2025

hearing, but nowhere in its briefing, Defendant identifies allegations in three paragraphs that it claims are not covered by the exclusion – paragraphs 80, 90, and 92.  Those paragraphs state:

> 80. Yachtbroker.org boasts that it includes co-brokerage member listings from [Defendant], CYBA, NYBA, and YBAA. This service allows members to control and exchange purchases and sales data and promote their products in ways never before achievable through private enterprise. Yachtbroker.org is now known as Yachtr.com, which is also industry owned.

> 90. Similarly, [Defendant's] Code of Ethics, which are part of [Defendant's] bylaws, state:

>> Section 17. Members should cooperate with other members on vessels listed with him whenever it is in the interest of the client. Negotiations concerning a vessel listed exclusively with one member should be carried on with the listing broker, not the owner, except with the express consent of the listing member. All shared commission agreements should be negotiated prior to the submission of any Offer to Purchase.

> 92. [Defendant] provides a model Central Listing Agreement that specifies the seller is solely responsible for the broker's commission. [Defendant] added that provision to the Purchase and Sale Agreement ("PSA") so that a broker can point to paragraph 5 of the PSA and reassure the buyer.

(DE 1-1 ¶¶ 80, 90, 92 (footnotes omitted)).  Contrary to Defendant's arguments, the allegations contained in these paragraphs, too, are part of the theory that Defendant establishes and enforces anticompetitive rules.  "Yachtbroker.org" is "an important pre-owned boat and yacht MLS" founded by Defendant and other associations "as an industry-wide association-owned MLS platform to serve the yacht brokerage community" (*id.* ¶ 79).  Again, the Underlying Complaint alleges that Defendant and its co-conspirators establish and enforce purportedly anticompetitive rules for their MLS, which only allow brokers to list and require listers to use standard listing agreements, as described in paragraph 92, that force sellers to pay inflated brokerage costs (*id.* ¶¶ 6-10).  These rules allegedly make it "virtually impossible for the owner of a large boat or yacht to obtain access to the market in order to sell it without the use of a broker . . ." (*id.* ¶ 210).  Paragraph 90 alleges specific facts supporting the theory that Defendant and others established

rules that direct brokers, who should be competing with one another, to cooperate in forcing sellers to pay inflated commissions or face disciplinary action (*id.* ¶¶ 83, 106). Reading the paragraphs cited by Defendant in conjunction with the other facts in the Underlying Complaint shows that they are part of, not separate from, the overarching legal theories that Defendant purportedly used its capabilities as a standard setting association to create an unreasonable restraint on trade.

Lastly, Defendant argued at the July 31, 2025 hearing that the Underlying Complaint claims Defendant set "anticompetitive rules," which are not the same as standards, and that these rules were advisory, not mandatory, which further shows they are not standards. Plaintiff countered that the exclusionary language delineates accreditation, certification, standard setting, *or similar such activities*, and if rule promulgating is not "standard setting," it falls under "similar such activities." The Court agrees. To the extent that rule promulgating by an association is different than standard setting, it is captured by the language in the exclusion referring to similar such activities. *See Stuart Sportfishing, Inc. v. Kehoe*, 541 So. 2d 169, 170 (Fla. Dist. Ct. App. 1989) ("Ejusdem generis provides that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned."). Rule promulgating is "of the same general kind" as standard setting and should therefore be considered a similar activity. *See Travelers Indem. Co. v. Figg Bridge Eng'rs, Inc.*, 389 F. Supp. 3d 1060, 1076 (S.D. Fla. 2019) ("The Exclusion, *by its own terms*, provides a non-exhaustive list . . . . (emphasis in original)). Furthermore, whether the facts in the Underlying Complaint describe Defendant's anticompetitive rules and standards as permissible or mandatory – for example, "[m]embers *should* cooperate with other members" as opposed to members *must* cooperate – does not remove the claims from the ambit of the exclusion.

The Court must look to the allegations of the Underlying Complaint, which describe Defendant's purported influence and disciplinary power over its members if there is a failure to comply with its anticompetitive rules.  Whether those allegations lack merit is of no import when analyzing the duty to defend.  *See Irvine v. Prudential Prop. & Cas. Ins. Co.*, 630 So. 2d 579, 579-80 (Fla. Dist. Ct. App. 1993) ("The duty is determined solely by the allegations against the insured, not by the actual facts, nor the insured's version of the facts.").

Ultimately, by virtue of its broad introductory language and its non-exhaustive list, the accreditation/certification/standard setting exclusion in the policy applies to the claims in the Underlying Complaint, thereby extinguishing Plaintiff's duty to defend.  Even though the policy does not specifically exclude antitrust claims, the facts and legal theories advanced in the Underlying Complaint link the allegations of price fixing and unreasonable restraint of trade to Defendant's capabilities as a standard setting and rule promulgating association for the yacht broker industry.  "This is not a case where the causal connection between" Defendant's association functions and the supposedly anticompetitive market resulting in artificially inflated brokers' commissions "was merely coincidental."  *Zucker*, 856 F.3d 1343, 1351 (11th Cir. 2017).  Quite the opposite, the Underlying Complaint describes in detail how Defendant's influence over its members and the industry facilitated its ability to promulgate rules and standards that resulted in sellers being forced to pay increased brokerage costs.  There is simply no denying the clear nexus between the allegations in the Underlying Complaint and Defendant's standard setting capabilities, such that the standard setting exclusion exempts Plaintiff from defending Defendant in the pending antitrust lawsuit.  "In the end, [Defendant] is stuck with the policies it paid for."  *Health First, Inc. v. Capitol Specialty Ins. Corp.*, 747 F. App'x 744, 751 (11th Cir. 2018).

## V.    CONCLUSION

Based on the foregoing, it is respectfully recommended that Plaintiff's Motion for Final Summary Judgment (DE 15) be **GRANTED**, and Defendant's Motion for Partial Summary Judgment (DE 23) be **DENIED**.  It is further respectfully recommended that Plaintiff owes no duty to defend or indemnify Defendant in *Ya Mon Expeditions, LLC, et al. v. International Yacht Brokers Association, Inc., et al.*, No. 24-CIV-20805 (S.D. Fla. Feb. 29, 2024).

## VI.    OBJECTIONS

The Parties will have fourteen (14) days from this Report and Recommendation to file written objections, if any, with the Honorable Darrin P. Gayles, United States District Judge. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in this Report and shall bar the Parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report, except upon grounds of plain error, if necessary, in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida on this 5th day of August, 2025.

_____
ELLEN F. D'ANGELO
UNITED STATES MAGISTRATE JUDGE

cc: All Counsel of Record